**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| |
|---|
| ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY, <br>     Plaintiff, <br><br> v. <br><br> WILLIAM KRAMER & ASSOCIATES, LLC, <br>     Defendant. |

No. 3:18-cv-00192 (MPS)

**RULING ON MOTION TO DISMISS**

Plaintiff, Endurance American Specialty Insurance Company ("Endurance"), brought this action on February 1, 2018, against William Kramer & Associates, LLC's ("WKA") related to WKA's assessment of damages to the Caravelle Resort in Myrtle Beach, South Carolina following Hurricane Matthew in October 2016. (ECF No. 1.) Endurance asserts negligence claims for failure to disclose and failure to mitigate, as well as a claim for breach of fiduciary duty. (ECF No. 1.) Two additional property insurers of the Caravelle Resort, James River Insurance Company ("James River"), and AXIS Surplus Insurance Company ("AXIS") intervened as plaintiffs and assert the same claims against WKA. (*See* ECF Nos. 32, 34.)

On August 31, 2018, WKA filed a third-party complaint against Madsen, Kneppers and Associates, Inc. ("Madsen") for common law indemnification, asserting that Madsen is liable for all or part of any damages that WKA owes the plaintiff and intervenor plaintiffs. (ECF No. 58 (hereinafter "Third-Party Complaint").) Madsen moves to dismiss the Third-Party Complaint for failure to state a claim. (ECF No. 82.) For the reasons explained below, Madsen's motion to dismiss is GRANTED.

1

I.      **Factual Allegations**

**Common Allegations**

The facts below are drawn from all operative complaints, including WKA's Third-Party Complaint against Madsen. (Endurance Compl, ECF No. 1; Axis Compl., ECF No. 32; James River Compl., ECF No. 34; Third-Party Compl., ECF No. 58.) Accordingly, these allegations are taken as true for the purposes of deciding the present motion to dismiss.

On October 8, 2016, Hurricane Matthew caused damage to The Caravelle Resort in Myrtle Beach, South Carolina ("Caravelle"). (ECF No. 1 ¶ 12; ECF No. 32 ¶ 12; ECF No. 34 ¶ 12; ECF No. 58 ¶ 5.) Caravelle held insurance policies issued by Endurance American Specialty Insurance Company ("Endurance"), Liberty Surplus Insurance Corporation ("Liberty"), James River Insurance Company ("James River"), and AXIS Surplus Insurance Company ("AXIS") (hereinafter Endurance, Liberty, AXIS, and James River collectively referred to as "the Market"). (ECF No. 1 ¶¶ 6–9; ECF No. 32 ¶¶ 6–9; ECF No. 34 ¶¶ 7–9; ECF No. 58 ¶ 6–7.)[1] On October 10, 2016, Caravelle submitted a claim to the Market (the "Claim") for the damages caused by Hurricane Matthew. (ECF No. 1 ¶ 13; ECF No. 32 ¶ 13; ECF No. 34 ¶ 13; ECF No. 58 ¶ 7.) William Kramer & Associates, LLC's ("WKA"), an independent loss adjustment firm, was appointed as loss adjuster as required under the Market Policies, and was assigned to adjust all claims related to damage from Hurricane Matthew. (ECF No. 1 ¶¶ 10–11, 14; ECF No. 32 ¶¶ 10–11, 14; ECF No. 34 ¶¶ 10–11, 14; ECF No. 58 ¶ 8.) WKA began evaluating the damages and taking steps to mitigate the potential for further damage on October 14, 2016. (ECF No. 1 ¶¶ 15–16; ECF No. 32 ¶¶ 15–16; ECF No. 34 ¶¶ 15–16; ECF No. 58 ¶ 9.)

---

[1] The policies consisted of a primary layer of $10 million, divided evenly between Endurance and Liberty, and an excess layer of $34 million, divided evenly between AXIS and James River. (ECF No. 1 ¶¶ 8–9; ECF No. 32 ¶¶ 8–9; ECF No. 34 ¶¶ 7–8.)

**Allegations of the Underlying Complaints Against WKA**

The following facts are taken from the Plaintiff's and Intervenor Plaintiffs' complaints against WKA. (*See* Endurance Compl, ECF No. 1; Axis Compl., ECF No. 32; James River Compl., ECF No. 34.) These facts are set forth only to provide context for WKA's third-party allegations; the Court does not accept them as true for the purposes of deciding this motion.

After WKA began its work, the Market retained Madsen, Kneppers and Associates, Inc. ("Madsen"), a construction consulting and engineering firm, to assist in the investigation and adjustment process and to develop protocols for remediating and repairing the damage caused by Matthew. (ECF No. 1 ¶¶ 17–18; ECF No. 32 ¶¶ 17–18; ECF No. 34 ¶¶ 17–18.) Madsen was tasked with identifying the damage proximately caused by Matthew and reporting its findings and recommendations to WKA for publication to the Market. (ECF No. 1 ¶¶ 18–19; ECF No. 32 ¶¶ 18–19; ECF No. 34 ¶¶ 18–19.)

On November 2, 2016, WKA estimated that the total loss estimate for mitigation and reconstruction was $2.9 million. (ECF No. 1 ¶ 20; ECF No. 32 ¶ 20; ECF No. 34 ¶ 20.) Over the following weeks, WKA's estimate rose repeatedly. (ECF No. 1 ¶ 21; ECF No. 32 ¶ 21; ECF No. 34 ¶ 21.) AXIS and James River retained an independent adjusting firm to peer review WKA's work. (ECF No. 1 ¶¶ 9, 21–22; ECF No. 32 ¶¶ 9, 21–22; ECF No. 34 ¶¶ 8, 21–22.) On December 30, 2016, WKA reported a revised estimated total loss value of $18 million. (ECF No. 1 ¶ 23; ECF No. 32 ¶ 23; ECF No. 34 ¶ 23.) The Market agreed to resolve Caravelle's Claim on January 27, 2017 for $24 million. (ECF No. 1 ¶ 24; ECF No. 32 ¶ 24; ECF No. 34 ¶¶ 24–25.)

Endurance, James River, and Axis allege that WKA failed to disclose "material facts and issues," including that Caravelle's "claimed damages were either preexisting or not proximately

caused by Hurricane Matthew." (ECF No. 1 ¶ 26; ECF No. 32 ¶ 26; ECF No. 34 ¶ 29.) More specifically, WKA did not relay "material information" it received from Madsen, including Madsen's concerns regarding rooms designated for reconstruction that were unaffected by Hurricane Matthew. (ECF No. 1 ¶¶ 27–29; ECF No. 32 ¶¶ 27–29; ECF No. 34 ¶¶ 30–32.) The Market relied upon WKA's representations "without being informed that much of the repair and reconstruction was unwarranted or unrelated to Hurricane Matthew damage." (ECF No. 1 ¶ 30; ECF No. 32 ¶ 30; ECF No. 34 ¶ 33.) As a result of WKA's failure to disclose relevant and material information to the Market about the source of the damage, the Market paid for the rehabilitation of the entire resort instead of only Hurricane Matthew-specific damages. (ECF No. 1 ¶ 32; ECF No. 32 ¶ 32; ECF No. 34 ¶ 35.) The Market alleges WKA knew or should have known that if it had properly disclosed material information, the Market "would not have agreed to pay for the scope of damages assessed by WKA." (ECF No. 1 ¶ 31; ECF No. 32 ¶ 31; ECF No. 34 ¶ 34.)

**Allegations of WKA's Third-Party Complaint Against Madsen**

The factual allegations below are drawn from WKA's Third-Party Complaint (ECF No. 58) against Madsen and are accepted as true for the purpose of adjudicating this motion.

On October 14, 2016, WKA began to inspect and assess the damage to Caravelle caused by Hurricane Matthew. (ECF No. ¶ 9.) During the course of WKA's work it became necessary to engage a construction consulting firm. (*Id.* ¶ 10.) "Madsen was engaged to provide remediation and repair consulting with respect to the Claim." (*Id.* ¶ 11.) "WKA relied on Madsen with regard to certain aspects of the adjustment of the Claim, including but not limited to remediation and repair." (*Id*. ¶ 12.) On November 2, 2016, Madsen provided WKA with a damage estimate of $3.1 million, which WKA conveyed to Endurance and Liberty. (*Id*. ¶ 13.) Madsen informed

4

WKA on or about November 7, 2016, that its estimate had increased to $5.1 million, which WKA also conveyed to Endurance and Liberty. (*Id.* ¶ 14.)

William Kramer personally traveled to Caravelle on November 21, 2016 to inspect the premises and meet with representatives from Caravelle, Madsen, and an accounting consultant to obtain additional information. (*Id.* ¶¶ 6, 15.) WKA received information from Caravelle on November 26, 2016 indicating a discrepancy between what Caravelle was expending and what Madsen had estimated would be necessary to expend to resolve the Claim. (*Id.* ¶ 16.) WKA subsequently contacted Madsen regarding a concern that Madsen may have underestimated the Claim, but Madsen informed WKA there was no reason to change its $5.1 million estimate. (*Id.* ¶¶ 17–18.) "Notwithstanding Madsen's belief that its estimate . . . was proper, WKA informed Endurance and Liberty of its concerns regarding estimate and the financial implications of the loss and Claim." (*Id.* ¶ 19.) WKA's concerns arose in part "from the process that Madsen was implementing . . . to distinguish between water damage from Hurricane Matthew and pre-existing mold." (*Id.* ¶ 20.)

Madsen provided an updated loss estimate of $9.5 million on December 22, 2016, which WKA provided to the Market. (*Id.* ¶ 21.) WKA asserts that this estimate omitted certain damages, including to elevators, utilities, and common areas. (*Id.* ¶ 22.) WKA informed the Market it believed the damages would "greatly exceed Madsen's estimates." (*Id.* ¶ 23.) WKA thus provided the Market with its own gross loss estimate of $18 million on December 30, 2016. (*Id.* ¶ 23.) AXIS informed WKA on January 2, 2017 that AXIS and James River were appointing York Specialized Loss Adjusting as the lead adjuster for the Claim, and the Market subsequently resolved the Claim for $24 million. (*Id.* ¶ 24–25.)

WKA alleges Madsen was negligent in preparing its estimates of damages, and that it failed "to take into account information that would have led it to conclude that it had underestimated the damages to . . . Caravelle." (*Id.* ¶ 28.) It asserts that "Madsen's negligence was [the] direct and proximate cause of any damages allegedly due to the Market from WKA." (*Id.* ¶ 29.) Madsen allegedly "exercised control over the estimates of damages to . . . Caravelle" and "WKA relied on Madsen's estimates of damages to Caravelle and did not know and had no reason to anticipate that Madsen would be negligent in preparing its estimates of damages and failing to take into account information that would have led it to conclude that it had underestimated the damage to . . . Caravelle." (*Id.* ¶ 30–31.) WKA claims that if it is found liable to Endurance, AXIS, and/or James River, Madsen is responsible to indemnify WKA for any such liability. (*Id.* ¶ 32.)

## II. Legal Standard

In considering a motion to dismiss under Rule 12(b)(6), the Court must determine whether the plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must accept all of the complaint's factual allegations as true, *id.* at 672, and "draw all reasonable inferences in favor of the non-moving party." *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008). "However, the tenet that a court must accept a complaint's allegations as true is inapplicable to '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'" *Gonzales v. Eagle Leasing Co.*, No. 3:13-CV-1565 JCH, 2014 WL 4794536, at *2 (D. Conn. Sept. 25, 2014) (citing

6

*Iqbal*, 556 U.S. at 678). "To determine the legal sufficiency of the third-party claim, the court must evaluate it against the background of the [main] complaint." *Conn. Gen. Life Ins. Co. v. SVA, Inc.*, 743 F. Supp. 107, 111 (D. Conn. 1990).

## III. Discussion

WKA argues that Madsen's negligence was the proximate cause of any damages that WKA owes the Market and asserts a claim for common law indemnification. In Connecticut, there is ordinarily "no right of indemnity or contribution between joint tort-feasors." *Kyrtatas v. Stop & Shop, Inc.*, 205 Conn. 694, 697 (1988) (quotation marks omitted). "Where, however, one of the defendants is in control of the situation and his negligence alone is the direct immediate cause of the injury and the other defendant does not know of the fault, has no reason to anticipate it and may reasonably rely upon the former not to commit a wrong, it is only justice that the former should bear the burden of damages due to injury." *Id.* (quotation marks omitted). To state a claim for common law indemnification, WKA must allege facts sufficient to show "(1) that [Madsen] was negligent; (2) that [Madsen's] negligence, rather than [WKA's], was the direct, immediate cause of the accident and injuries; (3) that [Madsen] was in control of the situation to the exclusion of [WKA]; and (4) that [WKA] did not know of such negligence, had no reason to anticipate it, and could reasonably rely on the other tortfeasor not to be negligent." *Skuzinski v. Bouchard Fuels, Inc.*, 240 Conn. 694, 698 (1997) (quotation marks omitted).

Madsen argues that WKA's indemnification claim fails because WKA has failed to plead facts sufficient to satisfy the second, third, and fourth elements of a claim for common law indemnification. (ECF No. 82 at 1–2.) I agree.

### A. Causation

7

WKA has not alleged facts suggesting that Madsen's negligence was "the direct, immediate cause" of the Market's injuries. *Skuzinski*, 240 Conn. at 698. Courts reviewing claims for common law indemnification "distinguish[] between active or primary negligence, and passive or secondary negligence," for purposes of causation. *Skuzinski*, 240 Conn. at 697 (quotation marks and alterations omitted). "Indemnity shifts the impact of liability from passive joint tortfeasors to active ones." *Id.* To satisfy the causation requirement of a common law indemnification claim, "a third-party plaintiff must not only allege that the third-party defendant [was] actively negligent, it must also allege facts to plausibly suggest that it [was] merely passively negligent." *O & G Indus., Inc. v. Aon Risk Servs. Ne., Inc.*, No. 3:12-CV-723 JCH, 2013 WL 4737342, at *5 (D. Conn. Aug. 30, 2013). Active negligence is the "direct, immediate cause of the accident and the resulting injuries." *Pouliot v. Paul Arpin Van Lines, Inc.*, 367 F. Supp. 2d 267, 271 (D. Conn. 2005). "Passive negligence is generally limited to constructive or technical fault, as where an owner of property is held liable for an injury on his property resulting from a dangerous condition caused by another working on his property." *In re Gen. Dynamics Asbestos Cases*, 602 F. Supp. 497, 501 (D. Conn. 1984).

Here, WKA asserts that Madsen was negligent "in preparing its estimates of damages and failing to take into account information that would have led it to conclude that it had *underestimated* the damages to . . . Caravelle." (ECF No. 58 ¶ 28 (emphasis added).) But the underlying complaints against WKA allege that WKA negligently *overestimated* the damages to Caravelle, leading the Market to overpay Caravelle for its losses. (*See* ECF No. 1 ¶ 43; ECF No. 32 ¶ 43; ECF No. 34 ¶ 46 ("As a direct and proximate result of WKA's breach of its duty owed to . . . the Market, the Market made indemnity payments to Caravelle far in excess of what was owed . . . .").) Indeed, WKA alleges that Madsen estimated the total claim at $9.5 million, but

WKA "informed the Market that it believed the damages would greatly exceed Madsen's estimates," and provided its own estimate of $18 million. (ECF No. 58 ¶¶ 21, 23.) WKA has alleged no facts that would support an inference that Madsen's underestimate caused it to in turn overstate the damages when providing its own estimate to the Market. Even if Madsen was negligent in arriving at its final valuation, the facts WKA alleges in the third-party complaint show that WKA assumed an active role by overruling Madsen's determination and providing its own estimate to the Market.

WKA argues that the question of negligence is not amenable to resolution on a motion to dismiss. (ECF No. 85 at 10); *see Weintraub v. Dahn*, 188 Conn. 570, 573–74 (1982) ("[T]he question of whether a party is primarily negligent and thereby precluded from indemnification from another tortfeasor is ordinarily one for the trier of fact."). Here, though, WKA alleges that it declined to accept Madsen's estimate and instead offered its own significantly higher estimate to the Market. In considering a motion to dismiss, courts accept the factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 672. The factual allegations in the third-party complaint, taken as true, do not set forth a plausible claim that Madsen was actively negligent and WKA was only passively negligent. WKA's common law indemnification claim thus fails as a matter of law.

B. **Control**

WKA's third-party complaint is also deficient because WKA's allegations in the third-party complaint, taken as true, plainly demonstrate that Madsen did not have "exclusive control" over the estimate process that ultimately caused the Market's injuries. WKA alleges that "Madsen was engaged to provide remediation and repair consulting" on Caravelle's claim. (ECF No. 58 ¶ 11.) The underlying complaints assert that Madsen was "designated to report its

findings and recommendations to WKA for publication to the Market." (ECF No. 1 ¶¶ 18–19; ECF No. 32 ¶¶ 18–19; ECF No. 34 ¶¶ 18–19.) WKA's allegations comport with the underlying complaints in this regard. Specifically, WKA asserts that Madsen provided it with estimates, which it then provided to the Market. (ECF No. 58 ¶ 13–14, 23.) Further, WKA alleges that it "informed the Market that it believed the damages would greatly exceed Madsen's estimates." (*Id.* ¶ 23.) In short, WKA told the Market that Madsen's estimate was much too low and provided its own, much higher estimate directly to the Market, thereby showing that WKA had the ability to disclaim Madsen's estimate and present its own to the Market. The Market is suing WKA alleging that WKA's conduct caused it to overpay. Thus, Madsen was not in "exclusive control" over the situation that gave rise to WKA's liability.

C. **WKA's Knowledge**

Finally, WKA has not alleged facts suggesting that WKA "did not know of [Madsen's] negligence, had no reason to anticipate it, and could reasonably rely on the other tortfeasor not to be negligent . . . ." *Skuzinski*, 240 Conn. at 698. To the contrary, WKA repeatedly alleges that it took issue with Madsen's loss estimates. (*See* ECF No. 58 ¶ 18 ("In early December 2016, WKA contacted Madsen about a concern that Madsen may have underestimated the claim."); *id.* ¶ 23 ("On December 30, 2016, Madsen informed the Market that it believed the damages would greatly exceed Madsen's estimates.") Thus, even if Madsen acted negligently and WKA established that Madsen's negligence caused it to make errors in its own estimates, it has alleged facts affirmatively demonstrating that it was aware of and considered Madsen's alleged negligence before it provided its injury-causing estimate to the Market.

## IV. Conclusion

For the reasons stated above, Madsen's motion to dismiss the Third-Party Complaint (ECF No. 82) is GRANTED.

IT IS SO ORDERED.

      /s/
Michael P. Shea, U.S.D.J.

Dated:    Hartford, Connecticut
            August 15, 2019