UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY, ET AL.<br><br>      Plaintiffs,<br><br>      v.<br><br>WILLIAM KRAMER & ASSOCIATES, LLC, ET AL.<br><br>      Defendants. | No. 3:18-cv-00192 (MPS) |

**RULING ON YORK'S MOTION TO DISMISS**

      Endurance American Specialty Insurance Company ("Endurance") brought this action on February 1, 2018, against William Kramer & Associates, LLC ("WKA"), a loss adjustment firm, related to WKA's assessment of damages at the Caravelle Resort in Myrtle Beach, South Carolina following Hurricane Matthew. ECF No. 1. Two additional property insurers of the Caravelle Resort, James River Insurance Company and AXIS Surplus Insurance Company, intervened as plaintiffs (hereinafter Endurance, AXIS, and James River collectively referred to as "the Plaintiffs"). *See* ECF Nos. 32, 34. The Plaintiffs assert negligence claims and a claim for breach of fiduciary duty against WKA related to its adjustment of the losses at the Caravelle Resort. ECF No. 126 at 6-8.

      On August 31, 2018, WKA filed third-party complaints for common law indemnification against Madsen Kneppers and Associates, Inc. ("Madsen") and York Risk Services Group, Inc. ("York"). ECF No. 58-59. Madsen filed a motion to dismiss WKA's third-party complaint, which I granted on August 15, 2019. ECF No. 121. On October 1, 2019, the Plaintiffs amended their complaint to assert a negligence claim against Madsen. ECF No. 126 at 9 (Count Four).

1

Madsen filed an Amended Answer, Affirmative Defenses and Cross-Claims against WKA and York. ECF No. 146. The cross-claims against York assert apportionment, contribution, and common law indemnification. ECF No. 146 at 15 ¶ 5, 17 ¶ 7. York moves to dismiss the cross-claims under Fed. R. Civ. P. 12(b)(6). ECF No. 151-1 at 5. For the reasons set forth below, the motion to dismiss is GRANTED in part and DENIED in part.

I.    FACTUAL ALLEGATIONS

The following facts are drawn from the operative complaints, including the Plaintiffs' First Amended Joint Complaint, ECF No. 126, and Madsen's Amended Answer, Affirmative Defenses and Cross-claims. ECF No. 146.[1] The factual allegations are accepted as true for the purposes of this ruling.

On "October 8, 2016, Hurricane Matthew impacted Myrtle Beach, South Carolina, causing [The] Caravelle [Resort] ("Caravelle") to sustain damage." ECF No. 126 ¶¶ 8, 15. Caravelle held insurance policies issued by Endurance, Liberty, James River, and AXIS. *Id.* at ¶¶ 9-12.[2] On "October 10, 2016, Caravelle submitted its claim to the [Plaintiffs] for the damages alleged to have been sustained due to Hurricane Matthew (the 'Claim')." *Id.* at ¶ 16. WKA, "an independent loss adjusting firm who acts on behalf of insurance companies, including the [Plaintiffs]," was "the designated loss adjuster pursuant to the terms of the [Plaintiffs'] policies and was assigned to adjust all claims made against the [Plaintiffs'] policies." *Id.* at ¶¶ 13-14. "On

---

[1] "The cross-claim must be construed against the background of the complaint, for it is only if the plaintiffs prevail against [the cross-claim plaintiffs] that they would have any basis to seek indemnity against [the cross-claim defendant]. Further, it is only on grounds alleged against [the cross-claim plaintiffs] that plaintiffs could prevail against them." *Cimino v. Yale Univ.*, 638 F. Supp. 952, 958 (D. Conn. 1986).

[2] The policies consisted of a primary layer of $10 million, divided evenly between Endurance and Liberty, and an excess layer of $34 million, divided evenly between AXIS and James River. *Id.* at ¶ 12.

October 14, 2016, WKA representatives arrived on site at Caravelle to begin its inspection and assessment of the storm related damage." *Id.* at ¶ 18.

"After an initial assessment of damage, it became apparent that WKA would require additional assistance; therefore, on or about October 18, 2016, the construction consulting and engineering firm, Madsen[,] was retained by WKA, on behalf of the [Plaintiffs] to assist in the investigative and adjusting process." *Id.* at ¶ 20. One of "Madsen's responsibilities was to identify and estimate the cost of the damage proximately caused by Hurricane Matthew and develop protocols for remediation and repairing the damage caused by Hurricane Matthew." *Id.* at ¶ 21. "Madsen was designated to report its findings and recommendations to WKA for publication to the [Plaintiffs]." *Id.* at ¶ 22. The initial estimate totaled $2,900,000, but "over the next weeks, the loss estimate continued to rise substantially." *Id.* at ¶¶ 23-24. "Concerned by the precipitous rise in WKA's and Madsen's damage assessment, the [Axis and James River] retained an independent adjusting firm[3] to peer review WKA's work on the project and to act as the loss adjuster on behalf of AXIS and James River." *Id.* at ¶ 25. "On or around December 30, 2016, WKA estimated a total loss value of $18,000,000." *Id.* at ¶ 26. "On or around January 27, 2017, [the Plaintiffs] agreed to resolve Caravelle's Claim for approximately $24,000,000. . . ." *Id.* at ¶ 27.

The Plaintiffs assert claims against WKA for negligence. ECF No. 126 at 6-8. They allege, among other failures, that WKA "failed to advise the [Plaintiffs] that a significant amount of the assessed damage was actually preexisting and not covered by the [Plaintiffs] policies." *Id.* at 126 ¶ 41. The Plaintiffs also allege that WKA failed to "mitigate the damage and to safeguard

---

[3] It is apparent from Madsen's pleading, ECF No. 146 at 15 ¶ 2, and from WKA's own third-party complaint against York, ECF No. 59 ¶ 17, that the independent adjusting firm hired to review WKA's work on the project was York.

3

[Caravelle] to prevent further damage from occurring." *Id.* at ¶¶ 47-48. Finally, the Plaintiffs allege that WKA breached its fiduciary duty by, among other failures, "failing to disclose to the [Plaintiffs] that a significant amount of the assessed damage was actually preexisting and not covered by the [Plaintiffs'] policies." *Id.* at ¶ 54.

The Plaintiffs assert a negligence claim against Madsen for breaching its duty "to act in a manner consistent with the level of care and skill ordinarily exercised by other professional consultants retained to assist in the investigation, documentation, repair and adjustment of insurance claims for large weather-related losses." ECF No. 126 at ¶ 58. The Plaintiffs also allege that "Madsen violated its duty [to Plaintiffs] by failing to perform an appropriate and adequate site inspection and moisture survey, failing to determine an appropriate scope or pricing to repair interior storm damage caused by Hurricane Matthew, failing to determine whether initial efforts undertaken by the insured and/or WKA to remediate the loss were reasonable, sufficient, or appropriate, failing to properly monitor repairs, failing to audit the contractors' costs, failing to properly document and differentiate the extent of pre-existing water damage and mold growth from water and mold damage that occurred as a result of Hurricane Matthew, failing to take necessary steps to mitigate the damage to Caravelle, failing to safeguard the site to prevent further damage from occurring, and by failing to recognize and communicate to the [Plaintiffs] that the property could be completely gutted and rehabilitated for less than the amount spent to remediate and repair the damage." *Id.* at ¶ 60.

In its cross-claims against York, which are the subject of this motion, Madsen alleges that York was "retained by Plaintiffs to provide certain adjusting services with respect to the Claim and provided such services to Plaintiffs." ECF No. 146 at 15 ¶ 2. Madsen alleges that "[i]f Plaintiffs sustained the losses and/or damages alleged in the Complaint, which Madsen denies,

4

said losses and/or damages were caused in whole or in part by the negligence of York . . . in that York failed to properly determine an appropriate scope or pricing to repair interior storm damage caused by Hurricane Matthew, failed to properly audit the contractors' costs, and/or failed to make appropriate recommendations to Plaintiffs concerning the adjustment of the Claim." *Id.* at 15, ¶ 3. Madsen also alleges that any damages sustained by the Plaintiffs "were the direct, immediate result of the active negligence of York in performing its adjusting services . . ., including because all, or substantially all, of the damages payments alleged in the Complaint are alleged to have been made after York was retained as loss adjuster for the Claim in the place of WKA . . . ." *Id.* at 16, ¶ 3.  According to Madsen, it "did not know of, and had no reason to anticipate, that York would be negligent in providing its adjusting services," including failing to determine an "appropriate scope or pricing to repair interior storm damage, failing to properly audit contractors, and failing to disclose material information to Plaintiffs. . . ." *Id.* at 16 ¶ 4. Madsen's claims against York appear in two counts, the first seeking apportionment and contribution (Count Four) and the second seeking indemnification (Count Five).

**I.     LEGAL STANDARD**

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court must determine whether plaintiffs have alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ray v. Watnick*, 688 F. App'x 41 (2d Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations and internal quotation marks omitted)). While the Court must "draw all reasonable inferences in favor of the non-moving party," *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104,

115 (2d Cir. 2008), it must grant the moving party's motion if "a complaint is based solely on wholly conclusory allegations and provides no factual support for such claims. . . ." *Scott v. Town of Monroe*, 306 F.Supp.2d 191, 198 (D. Conn. 2004). "Accordingly, 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (brackets omitted).

## II.   DISCUSSION

### A. <u>Apportionment (Count Four)</u>

Madsen seeks "an apportionment of liability pursuant to the doctrine of common law or equitable apportionment and/or statute." ECF No. 146 at 15 ¶ 5. York argues that statutory apportionment "provides the only mechanism by which [Madsen] may bring an apportionment claim against York," and that Madsen has failed to allege facts sufficient to satisfy the apportionment statute. ECF No. 151-1 at 11-12.

#### *1.   Statutory Apportionment*

Section 52-572h(c) of the Connecticut General Statutes "governs the apportionment of liability among multiple tortfeasors." *Crotta v. Home Depot, Inc.*, 732 A.2d 767, 771 (Conn. 1999).  This statute provides as follows:

> In a negligence action to recover damages resulting from personal injury, wrongful death or damage to property . . . if the damages are determined to be proximately caused by the negligence of more than one party, each party against whom recovery is allowed shall be liable to the claimant only for such party's proportionate share of the recoverable economic damages and the recoverable noneconomic damages. . . .

York argues that Madsen's apportionment claim falls outside the purview of this statute and should be dismissed "because the Plaintiffs have not suffered any damage to property;" rather, the apportionment claim "arises only out of 'commercial or economic losses.'" ECF No.

Case 3:18-cv-00192-MPS   Document 188   Filed 09/16/20   Page 7 of 18

151-1 at 12. "In the present matter, the only harm that the Amended Complaint alleges that the Plaintiffs have suffered is that they made indemnity payments to Caravelle far in excess of what would have been paid if [Madsen] had acted reasonably. Excessive indemnity payments clearly do not qualify as . . . damage to property." *Id.* at 12-13 (internal quotation marks omitted).

Connecticut law is clear that the apportionment statute does not apply to "purely commercial losses"—claims seeking compensation for commercial losses unaccompanied by physical damage to tangible property. *See Williams Ford, Inc. v. Hartford Courant Co.*, 657 A.2d 212, 224 (Conn. 1995) ("As a matter of statutory interpretation, therefore, we simply cannot stretch the meaning of 'damage to property,' as used in § 52–572h(b), to include commercial losses unaccompanied by physical damage to or loss of use of tangible property. In light of this legislative language and history, therefore, we conclude that the term 'damage to property,' as used in § 52–572h, does not include purely commercial losses.")[4] As York points out, Connecticut trial courts have held that the fact that a negligence case involves property does not, without more, make it a "negligence action to recover damages resulting from … damage to property" within the meaning of Section 52-572h(c). *See, e.g., 25 Beechcroft Rd., LLC v. Ciuffo*, FSTCV116008939S, 2012 WL 2149649, *6-8 (Conn. Sup. Ct. J.D. Stamford-Norwalk, May 16, 2012) (granting motion to dismiss apportionment claim where complaint alleged that architect defendant deviated from standard of care in designing house and thereby rendered the house "not

---

[4] Although *Williams Ford* addressed "damage to property" in Section 52-572h(b), rather than subsection (c), the subsection involved in this case, there is no reason to believe it would interpret the same phrase differently in another subsection of the same statute. *See, e.g., Brown v. Gardner*, 513 U.S. 115, 118 (1994) (referring to the "presumption that a given term is used to mean the same thing throughout a statute"); *see also 25 Beechcroft Road, LLC v. Ciuffo*, 2012 WL 2149649, *6 (Conn. Sup. Ct., J.D. Stamford-Norwalk, May 16, 2012) ("Although *Williams Ford* discussed the meaning of the phrase 'damage to property' under § 52–572h(b), courts have held that this interpretation of 'damage to property' is also applicable to § 52–572h(c)." (internal quotation marks omitted; citing cases).

7

sellable" within the local real estate market; complaint sought "pure economic losses," even though it "may imply that the property required repairs so that it conformed with the plans"); *Lunsford v. Goodwin*, No. CV-1160153S, 2011 WL 7095161, *3 (Conn. Sup. Ct., J.D. New Haven, December 28, 2011) (dismissing apportionment claim against third party defendants in negligent misrepresentation case involving sale of home in which misrepresentations allegedly led plaintiffs to pay "more than the property's fair market value").

Here, too, although the complaint arises from physical damage to the Caravelle Resort inflicted by Hurricane Matthew, it falls outside the purview of the apportionment statute. The Plaintiffs allege that, due to Madsen's negligence, they "made indemnity payments to Caravelle far in excess of what would have been paid if Madsen had acted reasonably." ECF No. 126 ¶ 61. This allegation of damages consists primarily of commercial loss, because most of the specifications of negligence against Madsen do not involve Madsen's causing any physical harm to the Caravelle Resort. *See id.* ¶ 60 (alleging, among other things, that Madsen failed to perform "an appropriate and adequate site inspection and moisture survey, failed to "determine an appropriate scope or pricing to repair interior storm damage caused by Hurricane Matthew," failed to determine whether initial efforts by the Caravelle Resort and WKA to remediate the loss were adequate, failed to monitor repairs, failed to audit contractors' costs, and failed to differentiate pre-existing mold growth from mold growth caused by the hurricane).

There are two specifications of negligence against Madsen that suggest that its negligence may have caused property damage—Madsen's failing "to take necessary steps to mitigate the damage to Caravelle" and failing "to safeguard the site to prevent further damage from occurring." *Id.* ¶ 60. But these are insufficient to bring the case within the apportionment statute. The statute requires not just that the action be one "to recover damages resulting from …

damage to property," but also that "the damages," i.e., the damages resulting from damage to property, be "determined to be proximately caused by the negligence of more than one party," in which case, "each party against whom recovery is allowed" is liable for that party's proportionate share of the recoverable damages. § 52–572h(c). There are no allegations suggesting that the *damages resulting from damage to property* could be "determined to be proximately caused by" York and thus no suggestion that recovery might be allowed against York for such damages. Madsen alleges that York provided negligent adjustment services, i.e., "York failed to properly determine an appropriate scope or pricing to repair interior storm damage …, failed to properly audit the contractors' costs, and/or failed to make appropriate recommendations to Plaintiffs concerning the adjustment of the" claim. ECF No. 146 at 15 ¶ 3. Any of these alleged failures by York might plausibly have led the Plaintiffs to pay excessive indemnity payments, but there is no allegation linking these failures to property damage. Unlike the allegations against Madsen, none of Madsen's allegations against York suggest that York played any role in failing to mitigate the damage to the Caravelle Resort or failing to safeguard it from further damage. In short, the type of damage for which York might plausibly be responsible under Madsen's allegations falls outside the purview of the apportionment statute.

    2. *Common Law Apportionment*

Next, Madsen argues that "[e]ven assuming that the Complaint alleges entirely commercial or economic losses, and the Court determines that statutory apportionment does not apply, York's Motion must still be denied because it fails to consider that Madsen is entitled to the 'common law or equitable' apportionment that Madsen has pleaded." ECF No. 168 at 6. York counters that "under Connecticut law, apportionment is only available through § 52-572h,

and thus [Madsen's] apportionment claim can only be analyzed under that statute." ECF No. 151-1 at 11.

At common law, Connecticut did not recognize apportionment. "Prior to [adoption of the first tort reform statute, which, after later amendments, became Section 52-572h] [Connecticut] adhered to the rules of joint and several liability with no contribution among joint tortfeasors. This doctrine can be stated succinctly. If the illegal conduct of each of the defendants was a proximate cause of the collision, they would be liable jointly and severally, the plaintiff would have a right to recover the entire amount of damages awarded from either, and, if he did so, the defendant paying them would have no right of contribution against the other; or the plaintiff might have sued either alone, and of course in the event of a recovery, that one would have been compelled to pay the entire amount of damages." *Donner v. Kearse*, 662 A.2d 1269, 1273 (Conn. 1995) (citation and internal quotation marks omitted).

However, Connecticut courts recognized "an exception to the common law doctrine of joint and several liability between and among joint tortfeasors, and to the common law corollary that there is no contribution between and among joint tortfeasors." *Reilly v. DiBianco*, 507 A.2d 106, 112 (Conn. App. 1986); *see also Gutowski v. New Britain*, 327 A.2d 552, 555 (Conn. 1973). The exception "is limited to those rare cases where the independent acts of two or more persons combine to bring about one injury *and* one of the actors seeks to isolate his monetary liability by proving the damages arising from his particular involvement in the harm to a plaintiff." *Reilly*, 507 A.2d at 112 (emphasis in original); *see also id.* at 113 ("If all of the defendants are parties in an underlying action of a plaintiff, each defendant may establish that portion of the plaintiff's judgment, if any, for which each is liable, if the harm is capable of division between and among them because each defendant has engaged in independent acts of harm."). In *Reilly*, two gasoline

10

service station employees assaulted an individual who they believed had stolen a checkbook. *Id.* at 109. One of the employees gave a statement to the police that he was the one that stabbed the individual with a knife during the struggle. *Id.* at 110. The individual "sought damages for an assault and battery committed by [the employees]" and a claim for vicarious liability against their employer. *Id.* at 107-08. "The jury returned verdicts in favor of the plaintiff against all three defendants in the total amount of $2,000,000, and returned a verdict of $2,000,000 against [the employer] and verdicts of $1,000,000 each against [the two employees]." *Id.* at 108. The employer moved to set aside the verdict. *Id.* The trial court denied the motion as to one employee, but granted it as to his liability for the other employee as to damages only "reasoning that [that employee] had punched and kicked the plaintiff but was not the actor in the stabbing which was the direct cause of the plaintiff's condition." *Id.* at 108, 111. The trial court "ordered a new trial limited to the issue of damages." *Id.* at 108-09.

The employer appealed claiming "that there was insufficient evidence to hold him vicariously liable for the actions of [either employee] and because the jury could not apportion damages between joint tortfeasors." *Id.* at 109. On appeal, the Appellate Court stated that the case was "the first appellate case in which a trial court had actually to apply the infrequently stated principle in this state that where the tortious intentional conduct of two or more persons combines to bring about harm to a plaintiff and one of the actors seeks to limit his liability because the harm is capable of apportionment between or among them, the burden of proof as to such apportionment is on that actor. . . . If there is a basis upon which a jury can apportion damages between and among joint tortfeasors who have committed concurrent but independent acts which are the proximate cause of one harm, there is no logical reason to prevent the jury from doing so." *Id.* at 112 (citations omitted).

Here, Madsen cites *Reilly* in support of its position that under common law, "[a]pplication of apportionment principles is also warranted based upon policy grounds for the same reasons referenced by the court[] in *Reilly*. . . ." ECF No. 168 at 8. Madsen has not alleged facts, however, suggesting that it "seeks to isolate [its] monetary liability by proving the damages arising from [its] particular involvement in the harm to [the Plaintiffs]." *Reilly*, 507 A.2d at 112. Nor has Madsen suggested how it could "isolate" the damages attributable to its own actions from those attributable to York's. The Plaintiffs allege one harm—payment "for the rehabilitation of the entire [Caravelle] Resort, rather than for the Hurricane Matthew-specific damages." ECF No. 126 at ¶ 36. Unlike the situation in *Reilly*, which involved the possibility of independent harm flowing from a stabbing, it is unclear how the alleged harm from the Plaintiffs' alleged overpayment in this case is "capable of division" and thus can be apportioned. *Reilly*, 507 A.2d at 113 ("[E]ach defendant may establish that portion of the plaintiff's judgment, if any, for which each is liable, if the harm is *capable of division* between and among them because each defendant has engaged in independent acts of harm"; noting that "[c]ases from other jurisdictions, based on facts similar to this case, albeit sometimes pursuant to statutes, generally hold that *apportionment between defendants should be allowed when the damages are capable of being apportioned*." (emphasis added)).[5]

Madsen alleges that the Plaintiffs' damages "were caused in whole or in part by the negligence of York including its officers, agents, servants, employees and/or consultants, with

---

[5] *Reilly* may be distinguishable for another reason, which is that it involved tortfeasors named as defendants by the same plaintiff. See 507 A2.d at 113 (*If all of the defendants are parties in an underlying action of a plaintiff*, each defendant may establish that portion of the plaintiff's judgment, if any, for which each is liable, if the harm is capable of division between and among them because each defendant has engaged in independent acts of harm." (emphasis added)). By contrast, in this case, the Plaintiffs have not named York as a defendant; York is only a third-party defendant, having been impled by both Madsen and York.

regard to York's adjustment of the Claim, including without limitation in that York failed to properly determine an appropriate scope or pricing to repair interior storm damage caused by Hurricane Matthew, failed to properly audit the contractors' costs, and/or failed to make appropriate recommendations to Plaintiffs concerning the adjustment of the Claim." ECF No. 146 at 15 ¶ 3. These allegations, however, track the Plaintiffs' allegations against Madsen: The Plaintiffs allege that Madsen failed to "determine an appropriate scope or pricing to repair interior storm damage caused by Hurricane Matthew . . . fail[ed] to audit the contractors' costs . . . and fail[ed] to recognize and communicate to the Market that the property could be completely gutted and rehabilitated for less than the amount spent to remediate and repair the damage." ECF No. 126 at ¶ 60. Taken together, these allegations do not suggest that any independent act caused a portion of the Plaintiffs' alleged overpayment damages, the possibility suggested in *Reilly*; instead, they suggest either that Madsen's negligence (or, perhaps, Madsen's and WKA's negligence) or York's negligence caused the overpayment harm or that the combined negligence of all three – WKA, Madsen, and York – caused that harm.

      Nonetheless, I agree with my colleague, Judge Hall, that "a Motion to Dismiss is [not] the appropriate stage at which to require proof of distinguishable harm*." O&G Industries, Inc. v. Aon Risk Services Northeast, Inc.*, 2013 WL 4737342, at \*10 (D. Conn. Aug. 30, 2013) (declining to dismiss common law apportionment claim). It is worth noting that both *Reilly* and *Gutowski* had the benefit of full trial records in articulating the principles described above. Although I, too, "question[] whether [Madsen] will ultimately be able to prove independent acts of harm" that might bring it within the "rare" *Reilly* exception, I am unwilling to dismiss the common law apportionment claim on that basis at the pleadings stage. *Id.*

13

## B. Contribution (Count Four)

Madsen claims it is "entitled to contribution from York to the extent permitted by law." ECF No. 146 at 15 ¶ 5. York argues that "[Madsen's] contribution claim . . . is not ripe for review because under Connecticut law no party has a right to contribution until after it is assigned liability in the underlying matter." ECF No. 151-1 at 14.

"[C]ontribution involves a claim for reimbursement of a share of a payment necessarily made by the claimant which equitably should have been paid in part by others." *Crotta*, 732 A.2d at 772 (internal quotation marks and citation omitted). "A right of contribution arises only after a judgment has been rendered." *Associated Constr. / AP Constr., LLC v. Hanover Ins. Co.*, No. 3:15-CV-1600, 2018 WL 3998972, *7 (D. Conn. 2018) *citing Hanover Ins. Co. v. Fireman's Fund Ins. Co.*, 586 A.2d 567, 574 (Conn. 1991) ("The right of action for contribution . . . arises when, as between multiple parties jointly bound to pay a sum of money, one party is compelled to pay the entire sum. That party *may then assert* a right of contribution against the others for their proportionate share of the common obligation.") (emphasis added). A claim for contribution is premature when judgment has not yet been obtained. *See Kemper Independence Ins. Co. v. Superior Plus Energy Services*, CV146017269, 2016 WL 5009632, *2 (Conn. Sup. Ct., J.D. Antonia-Milford, August 10, 2016) (striking contribution count as premature).

Madsen does not cite cases to the contrary. Madsen requests leave to re-plead. I decline to grant such leave. Madsen had notice of York's arguments and had an opportunity to address those arguments in an amended pleading. York moved to dismiss Madsen's cross-claims on December 23, 2019. ECF No. 145. In its memorandum in support of that motion, York set forth its argument that Madsen's claim for contribution was not yet ripe. *See id.* at 12-13. Madsen filed

its amended answer and cross-claims the following day, December 24, 2019, on notice of York's arguments. Furthermore, Madsen has offered no explanation as to how it could plead around this flaw to assert facts sufficient to plead a cross-claim for contribution.

### C. Indemnification (Count Five)

In Connecticut, "[o]rdinarily there is no right of indemnity or contribution between joint tortfeasors. . . . Where, however, one of the defendants is in control of the situation and his negligence alone is the direct immediate cause of the injury and the other defendant does not know of the fault, has no reason to anticipate it and may reasonably rely upon the former not to commit a wrong, it is only justice that the former should bear the burden of damages due to injury." *Kyrtatas v. Stop & Shop, Inc.*, 535 A.2d 357, 358 (Conn. 1988) (internal quotation marks and citations omitted). "To assert a claim for indemnification . . . a[] defendant must show that: (1) the party against whom the indemnification is sought was negligent; (2) that party's active negligence, rather than the defendant's own passive negligence, was the direct, immediate cause of the accident and the resulting injuries …; (3) the other party was in control of the situation to the exclusion of the defendant seeking reimbursement; and (4) the defendant did not know of the other party's negligence, had no reason to anticipate it, and reasonably could rely on the other party not to be negligent." *Smith v. New Haven,* 779 A.2d 104, 110-11 (Conn. 2001).

York argues that Madsen's claim for indemnification should be dismissed because Madsen has failed to allege, and cannot allege, facts sufficient to satisfy the second and third elements—active/passive negligence and exclusive control. ECF No. 151-1 at 18, 21.

#### 1. *Active/Passive Negligence*

Connecticut courts distinguish between "active or primary negligence," and "passive or secondary negligence." *See, e.g., Crotta*, 732 A.2d at 772. "Indemnity shifts the impact of

liability from passive joint tortfeasors to active ones." *Skuzinski v. Bouchard Fuels, Inc.*, 694 A.2d 788, 790 (Conn. 1997). "Primary, active negligence is the direct, immediate cause of the accident and the resulting injuries. Passive negligence is generally limited to constructive or technical fault, as where an owner of property is held liable for an injury on his property resulting from a dangerous condition caused by another working on his property. To allege this second element of an indemnification claim, a third-party plaintiff must not only allege that the third-party defendant is actively negligent, it must also allege facts to plausibly suggest that it is merely passively negligent." *O & G Indus., Inc.,* 2013 WL 4737342, at *5-6 (concluding that the allegations did not raise a plausible claim of active and passive negligence) (internal quotation marks and citations omitted).

The Plaintiffs have alleged that Hurricane Matthew caused damage on October 8, 2016. ECF No. 126 at ¶ 15. On October 18, 2016, WKA retained Madsen to "assist in the investigative and adjusting process." *Id.* at ¶ 20. Madsen was to "identify and estimate the cost of the damage proximately caused by Hurricane Matthew and develop protocols for remediation and repairing the damage caused by Hurricane Matthew." *Id.* at ¶ 21. In addition, it was to "report its findings and recommendations to WKA for publication to the [Plaintiffs]." *Id.* at ¶ 22. On November 2, 2016, WKA estimated the loss at $2,900,000, but "over the next weeks, the loss estimate continued to rise substantially." *Id.* at ¶¶ 23, 24. "Concerned by the precipitous rise in WKA's and Madsen's damage assessment, the Excess Layer retained an independent adjusting firm to peer review WKA's work on the project and to act as the loss adjuster on behalf of AXIS and James River." *Id.* at ¶ 25. These facts, taken as true, suggest that York's involvement did not begin until the estimating process and related activities by WKA and Madsen had begun and reached a level that "[c]oncerned" the Plaintiffs. *Id.* The complaint does not explicitly state when

16

York was retained, but it suggests it was after Madsen had already begun to perform its duties and to develop protocols for remediation and repair. *Id.* at ¶ 21. Madsen alleges no facts that demonstrate how York, not having been involved from the outset, was "actively" negligent while Madsen was clearly "passively" negligent.

Nor does Madsen allege facts suggesting that York's negligence was the direct, immediate cause of the Plaintiffs' injury. Madsen merely makes the conclusory statement that the "damages were the direct, immediate result of the active negligence of York in performing its adjusting services." ECF No. 146 at 16 ¶ 3. The only fact that Madsen alleges to support this claim is that "all, or substantially all, of the damages payments alleged in the Complaint are alleged to have been made after York was retained as loss adjuster for the Claim in the place of WKA and/or retained to provide analysis and recommendations concerning the Claim to Plaintiffs." *Id.* But as noted, under the facts alleged by the Plaintiffs, Madsen was involved in assisting with the loss adjustment before York was retained, engaged in conduct together with WKA that produced a "precipitous rise" in the damage assessment, and failed in its duties to "assist in the investigation, documentation, repair and adjustment of insurance claims" on the Plaintiffs' behalf.  ECF No. 126 at ¶¶ 25, 58, 60. None of this suggests that York, to the exclusion of Madsen, was the "direct, immediate cause" of Plaintiffs' paying an excessive amount of indemnity. Madsen's conclusory allegation aside, the pleadings set forth no facts that would make such a finding plausible.

   2. *Control*

Madsen has also failed to allege facts to support a plausible claim that York had "exclusive control" over the estimate, adjustment, and mitigation process that ultimately caused the Plaintiffs' injury. The Plaintiffs allege that Madsen "raised concerns directly with WKA that

rooms determined to be unaffected by Hurricane Matthew were nonetheless designated for reconstruction." ECF No. 126 ¶ 30. "Based on [WKA's and Madsen's] evaluation of the damage [WKA and Madsen] knew, or should have known, that the costs to remediate and repair . . . was going to greatly exceed the cost of gutting and rehabilitating the property." *Id.* at ¶ 32. At a minimum, the Plaintiffs' allegations suggest that Madsen was making evaluations of the damage, submitting them to WKA, and raising concerns. None of this is consistent with the notion that *York* was in "exclusive control" over the situation that gave rise to the Plaintiffs' injury. Madsen's only allegation in support of that notion is its conclusory statement that "York was in control of the above-referenced adjusting services to the exclusion of Madsen." ECF No. 146 at 16 ¶ 6. I, therefore, dismiss Madsen's claim for indemnification. And for the reasons set forth as to the cross-claim for contribution, I decline to allow Madsen to replead this claim.

### III. CONCLUSION

For the foregoing reasons, York's motion to dismiss, ECF No. 151, is GRANTED in part and DENIED in part. The claim for common law apportionment (Count Four) may proceed. The claims for contribution (Count Four) and indemnification (Count Five) are dismissed.

IT IS SO ORDERED.

/s/

Michael P. Shea, U.S.D.J.

Dated:   Hartford, Connecticut

September 16, 2020